# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| GENERAL MOTORS CORPORATION, | Civil No. 08-5150 (JRT/AJB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| HARRY BROWN'S, LLC, | |
| Defendant. | |

Jeffrey J. Jones, **JONES DAY**, 525 John H. McConnell Boulevard, Suite 600, Columbus, OH 43215; and Kerry L. Bundy, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402-3901, for plaintiff.

Robert L. DeMay, Curtis D. Ripley, and Mark Jacobson, **LEONARD STREET & DEINARD, PA**, 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402, for defendant.

On September 10, 2008, plaintiff General Motors Corporation ("GM") moved for a preliminary injunction against Harry Brown's, LLC ("Harry Brown"), seeking to enjoin Harry Brown from consolidating operations from its GM and Chrysler dealerships at a single GM facility. The parties agreed to a standstill agreement to facilitate settlement negotiations, but on November 20, 2008, Harry Brown exercised its right to terminate the agreement and the Court set a hearing on GM's motion for a preliminary injunction. For the reasons stated in this Memorandum Opinion, GM's motion is denied..

## BACKGROUND

GM is a manufacturer and distributor of new motor vehicles, which it sells to the public through a network of new motor vehicle dealers. (Docket No. 11 at 3.)  Dealer Sales and Service Agreements ("Dealer Agreements") govern the relations between GM and its dealers, authorizing dealers to sell and service GM vehicles and use GM's trademarks. (*Id.*)

Harry Brown entered into five separate Dealer Agreements with GM, which enable Harry Brown to operate five GM "linemakes," GMC, Buick, Chevrolet, Cadillac, and Pontiac, at facilities at 1747 Grant Street, Faribault, Minnesota. (*Id.*)  Under those agreements, Harry Brown is not authorized to conduct any other dealership operations at that location. (*Id.*)  Further, GM must give prior authorization for any changes that Harry Brown wishes to make to the use of the premises, for example by adding additional dealership operations or "other vehicle lines" to the dealership facility.   (Dealer Agreements, Docket No. 2-2.)  GM may address any material breach of the Dealer Agreements by terminating the contract. (*Id.*)

The Harry Brown GM dealerships are operated by Harry Brown's, LLC, which is a "sister" company to Faribault Chrysler.  Brothers Michael Brown and Steven Brown operate the Harry Brown's GM dealerships and Faribault Chrysler, respectively, and often collaborate on major business decisions. (Docket No. 34 at 3.)  Harry Brown claims that financial concerns about Faribault Chrysler led the Brown family to conclude that it was no longer feasible to operate Faribault Chrysler at a separate facility. (*Id.*)  In order to prevent Faribault Chrysler's financial collapse, the Brown family considered

"dualing" the non-GM linemakes from Faribault Chrysler with GM linemakes at the GM facility. (*Id.*)

On May 20, 2008, Harry Brown submitted a Change Request to GM seeking approval to add three non-GM linemakes (Chrysler, Dodge, and Jeep) to Harry Brown's GM facilities at 1747 Grant Street (the "Chrysler Proposal"). (Docket No. 11 at 4.) When submitting the request, Harry Brown was also required to submit a "Submission Acknowledgement," which stated, "Requestor acknowledges the addition of a non-GM line to the existing Dealer Company, dealership operations, and/or dealership premises is a violation of GM Policy and subject to rejection by GM." (Docket No. 34 at 6.) On July 28, 2008, GM responded in writing, informing Harry Brown that GM would not approve the Change Request. (*Id.* at 5.) GM reasoned that "GM's policy is that non-GM products should not be sold or serviced from GM dealerships," noting that the combination with competing brands "is detrimental to the sale and service of GM products." (*Id.*) Further, GM noted that "[s]uch combinations dilute the image of a GM dealership portrayed to the community, reduce the space and capital available for inventorying and marketing GM products, and divert the single minded focus of sales and service management and staff . . . [i]n an increasingly competitive automotive business environment." (*Id.*)

Disregarding GM's rejection of the Chrysler Proposal, Harry Brown announced that it intended to add the non-GM linemakes to the GM facility on September 15, 2008. (Docket No. 11 at 9.) GM responded by claiming that Harry Brown's actions would

constitute a material breach of the Dealer Agreements and noting its intent to "pursue any relief available under the Dealer Agreement and applicable law." (Docket No. 34 at 8.)

On September 10, 2008, GM commenced this action and moved for a temporary restraining order and preliminary injunction enjoining Harry Brown from moving any of the non-GM linemake operations to the 1747 Grant Street facility. (Docket No. 1.) GM's complaint seeks (1) declaratory judgment that GM properly declined to approve the Chrysler Proposal; (2) specific enforcement of the Dealer Agreement; (3) declaratory judgment that Minn. Stat. § 80E(12)(h) is inapplicable to the current case; (4) temporary and permanent injunctive relief; and (5) declaratory judgment that GM has a contractual right to terminate Harry Brown's GM Dealer Agreements. (*Id.*) After the complaint was filed, the parties negotiated a standstill agreement to provide time to negotiate a settlement. (Docket No. 34 at 10.) Citing serious imminent financial difficulties, Harry Brown exercised its right to terminate the standstill agreement effective November 20, 2008. (*Id.*) GM now renews its motion for a temporary restraining order and preliminary injunction and seeks to enjoin Harry Brown from adding Dodge, Chrysler, or Jeep operations at Harry Brown's GM facility. (*Id.*)

## DISCUSSION

### I.   STANDARD OF REVIEW

In determining whether a party is entitled to a preliminary injunction, the Court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties

litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). "The question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-30 (2d. ed. 1995)).

## II.   THE THREAT OF IRREPARABLE HARM

The irreparable harm factor focuses on the harm or potential harm to the plaintiff of defendants' conduct or threatened conduct. *Dataphase,* 640 F.2d at 114. A plaintiff seeking preliminary injunction must establish that it "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *see also Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506-07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.").

GM claims that it will suffer immediate, irreparable harm from the commingling of GM and non-GM brands if Harry Brown implements the Chrysler Proposal. (Docket

No. 11 at 21.)   GM first argues that consolidating operations for GM and non-GM linemakes at a single facility will decrease GM "sales effectiveness." (Docket No. 6 at 3, 5-6; Docket No. 55.)  Essentially, GM alleges that Harry Brown's commingling of GM and non-GM linemakes will result in lost profits.  The law is clear, however, that "[a] dollar loss invokes the Court's legal powers, as opposed to its equitable powers." *Halikas v. Univ. of Minn.*, 856 F. Supp. 1331, 1334 (D. Minn. 1994) (citing *Franklin v. Gwinnett Cty. Pub. Sch.,* 503 U.S. 60, 75-76 (1992)).  Indeed, the Farhat affidavits, which are offered in support of GM's motion, seek to *quantify* a decrease in sales effectiveness that results from dualing at GM dealerships.  (*See generally* Docket Nos. 6, 55.)  An award of damages would provide GM with an adequate legal remedy[1] for lost profits and preliminary injunctive relief is therefore not appropriate.  *See Watkins*, 346 F.3d at 844.

GM also argues that it would be impossible to quantify the harm in dollars of "loss of customer satisfaction, diversion of customer relationships, the loss of goodwill, the dilution of its trademarks, the destruction of its branding strategy, and the commingling of confidential and proprietary information."  (Docket No. 11 at 21.)  The record indicates, however, that there are approximately thirty dealerships in Minnesota that currently dual GM and non-GM linemakes with GM's approval.  (Docket No. 34 at 30.)  At argument, GM contended that these dualing dealerships are not similar to Harry Brown's proposed dealership:  either the non-GM linemakes are operated in separate

---

[1] At the hearing, the parties conceded that termination of the GM Dealer Agreements solely for dualing is impermissible under Minnesota law.  Because the analysis in this section renders further conclusions as to legal remedies unnecessary, the Court does not address whether termination would be available here on some other grounds.

facilities at the same location as  GM linemakes or the dealerships that dual at a single facility were "grandfathered" in under older GM policies that did not discourage dualing. (Docket No. 54 at 5.)

The Court, however, does not find from the record an appreciable distinction between the dealerships that dual in a single facility as opposed to those that dual in multiple facilities at the same location.  Moreover, GM's supporting affidavits of Berger, Nevin, Puff, and Tamar, offer no more than mere speculation on this issue.   Those affidavits opine that customer goodwill and GM trademarks will be irreparably damaged merely because non-GM linemakes are sold and serviced from the same facility.  (E.g., Docket No. 5 at 15-16.)  The affidavits cite general principles of business, but fail to sufficiently establish that any of the already-dualing Minnesota GM dealerships have irreparably harmed GM in the manner averred here.  Further, the affidavits fail to show that dualing at *this* dealership, approximately the thirty-first dualing dealership in Minnesota, will have an irreparable negative impact on GM customer goodwill, branding strategies, trademark dilution, or identification by customers.

GM's failure to demonstrate irreparable harm is sufficient to end the Court's *Dataphase* analysis.  *Watkins*, 346 F.3d at 844.  The Court notes, however, that the balance of harms and the public interest further tip the balance against granting GM's motion.

## III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST

The Court next balances the harm to the movant against "the injury that granting the injunction will inflict on other parties litigant." *Dataphase*, 640 F.2d at 113. "What must be weighed is the threat to each of the parties' rights and economic interests that would result from either granting or denying the preliminary injunction." *Pro Edge, L.P. v. Gue*, 374 F. Supp. 2d 711, 751 (N.D. Iowa 2005).

As noted above, GM's allegation of potential lost sales can be remedied through an award of monetary damages and GM's other alleged harm is little more than speculation. GM also argues that the balance of harms does not tip in favor of Harry Brown because "Harry Brown cannot claim to be hurt by an injunction requiring compliance with its contract." (Docket No. 11 at 22.)  GM's contractual compliance argument fails, as well, however, because it assumes the fact that it attempts to prove: that Harry Brown is not fulfilling its contractual obligations under the Dealer Agreements. Harry Brown disputes this assertion. As to the harm to Harry Brown, Harry Brown risks losing a significant part of its family business and has provided affidavits from dealership management indicating that injunctive relief would increase this risk. (*See generally* Docket No. 44.) Thus, the balance of harms, in particular the economic threats to the parties, disfavors GM's motion.

GM contends that considering Faribault Chrysler's financial condition is irrelevant to the present litigation. GM argues that because Chrysler and GM sell competing products, it is "ironic" to argue that GM must sell Chrysler products to "save" Chrysler. (Docket No. 49 at 19.)  Although the Court agrees that it cannot force GM to sell

Chrysler products to "save" Chrysler, GM mischaracterizes what is at issue.  First, the Court is not requiring GM to sell anything:  GM is the movant in this case, and the Court is considering whether to *bar* action by Harry Brown.  Second, the parties in this case are not two manufacturers, like Chrysler and GM.  Rather, this is a conflict between a manufacturer and a dealer and the legal issues center on the parties' contractual rights under the Dealer Agreements.

Assuming, without deciding, that Faribault Chrysler is not a "party litigant" for the purposes of the second prong of the *Dataphase* test, the public interest also supports denial of GM's motion.  The affidavits submitted by Harry Brown suggest that Faribault Chrysler is in a precarious financial condition.  (Docket No. 44.)  Harry Brown also introduces information that consolidating the dealership operations may enable Faribault Chrysler's non-GM linemakes to remain viable.  In light of the potential loss of nineteen jobs, the public interest weighs against the "extraordinary and drastic" injunctive relief requested by GM.  *See Mazurek,* 520 U.S. at 972.

Although GM's likelihood of success on the merits cannot tip the balance of equities in favor of granting GM's motion, the Court briefly considers this *Dataphase* factor.

## IV.    THE LIKELIHOOD OF SUCCESS ON THE MERITS

The Eighth Circuit recently clarified the "success on the merits" prong of the *Dataphase* test, noting that "where a preliminary injunction is sought to enjoin . . . [a] government action based on presumptively reasoned democratic processes . . . courts

must make a threshold finding that a party is likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 732-33 (8th Cir. 2008).   In circumstances that do not fall under this category, such as those at issue here, courts merely determine whether the plaintiff has a "fair chance of prevailing." *Id.* at 732.

GM argues that it is likely to prevail in the litigation based on its valid exercise of its business judgment to decline to approve the Chrysler Proposal.   GM cites to the Dealer Agreements, which state, "No change in location or in the use of the Premises, including addition of any other vehicle lines, will be made without General Motors prior written authorization pursuant to its business judgment."   (Dealer Agreements, Docket No. 2-2, ¶ 4.42.)   Harry Brown responds that GM's authority to approve these types of changes must be couched in the context of "dealer network planning considerations." (Docket No. 34 at 13.)   Section 4.1 of the Dealer Agreements, "Dealer Network Planning," states that "[b]ecause General Motors distributes it's [sic] products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors Products competitively."   (Docket No. 2, Ex. 2, ¶ 4.1.)

Section 4, which is entitled "Authorized Locations," addresses "Dealer Network Planning" (¶ 4.1), "Area of Primary Responsibility" (¶ 4.2), "Establishment of Additional Dealers" (¶ 4.3), and "Facilities" (¶ 4.4); which includes "Location" (¶ 4.4.1), "Change in Location or Use of Premises" (¶ 4.4.2), "Size" (¶ 4.4.3), "Dealership Image and Design" (¶ 4.4.4), and "Dealership Equipment" (¶ 4.4.5).   Thus from the context of Section 4, it

would appear that "Dealer Network Planning" exists separately and distinctly from other provisions addressing the location or use of dealerships.

Section 4.4.2 *does* mention dealer network planning considerations: "If Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those premises, Dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, for General Motors evaluation and final decision *in light of dealer network planning considerations*." (Docket No. 2, Ex. 2, ¶ 4.4.2 (emphasis added).)  As repeated from the Dealer Agreements, above, however, GM specifically conditions changes to the premises on its business judgment review of the proposed changes.  (*Id.*)  The plain language of the contract merely indicates that dealer network planning is one, albeit an important one, of the criteria that GM will use to evaluate a Change Request pursuant to that business judgment.

Harry Brown challenges this discretionary review by claiming that GM cannot enforce prohibitions on "non-dualing" that are not delineated in the Dealership Agreements.[2]  (Docket No. 34 at 18.)  It does not appear from the present record, however, that GM is attempting to add a new "dualing" prohibition to the Dealer

---

[2] Harry Brown claims that the Submission Acknowledgement that GM required Harry Brown to submit with their Change Request violates statutory and common law.  (Docket No. 34 at 19.)  In effect, Harry Brown claims that the Submission Agreement permits GM to acquire rights not provided for in the Dealer Agreements.  (*Id.* at 21.)  The Submission Acknowledgement states: "Requestor acknowledges that the addition of a non-GM line to the existing Dealer Company, dealership operations, and/or dealership premises *is a violation of GM Policy and subject to rejection by GM.*"  (Docket No. 11 at 11 (emphasis added).)  Here, it seems that GM is merely referencing its current policy against non-dualing, which could be construed as an exercise of its reasonable business judgment.  Further, GM states that such a request is "subject to rejection," but it does not state, categorically, that all such requests *will* be rejected.

Agreements.  Rather, it appears that GM is exercising its business judgment, in light of the present economic and business conditions, to preserve GM's competitive position in the market.  If GM implements a policy in which they decline to approve dualing dealerships, that decision is within their province as a business to make.  *See, e.g., Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001) ("Under the [Dealership] Agreement, it is [Ford Motor Company's] *own* judgment that controls, not [the dealer's] judgment, not a jury's judgment and not a reasonable person's judgment." (second and third alterations added)).

Nonetheless, "[t]he likelihood that plaintiff ultimately will prevail is meaningless in isolation." *Dataphase*, 640 F.2d at 113.  Rather, that likelihood "must be examined in the context of the relative injuries to the parties and the public." *Id.*  Although at this stage of the litigation GM has demonstrated a strong chance of success on the merits, GM failed to demonstrate that it will be irreparably harmed if the Court does not grant injunctive relief.  In addition, the potential harm that will fall on other parties strongly weighs against ordering injunctive relief.  Accordingly, the Court denies GM's motion.

## CONCLUSION

This analysis militates against granting GM's instant motion, but the Court emphasizes that it does not conclude here that GM may not enforce a policy of non-dualing under its Dealer Agreements.  Instead, the Court merely finds that GM has not demonstrated, in this case, that it would be irreparably harmed such that preliminary injunctive relief should issue.  Indeed, it appears that GM has made a strong case at this

stage of the litigation that it is entitled to exercise its business judgment in denying a dealer's request to dual GM and non-GM linemakes.  The Court further notes that it would not be impossible to reverse Harry Brown's apparently imminent implementation of the Chrysler Proposal.  If GM succeeds on the merits of its claims, however, the ultimate financial burden of such a reversal, including any expenditures made to prepare for consolidation of non-GM linemakes, could well fall on Harry Brown.

Additionally, after receipt of GM's reply memorandum, Harry Brown filed a motion to strike the affidavit of Richard F. Bero, which supported GM's reply.  Upon review of the motion by the Court, Harry Brown's motion is denied.

# ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1.      Plaintiff General Motors Corporation's Motion for Preliminary Injunction against defendants [Docket No. 9] is **DENIED.**

2.      Defendant Harry Brown's, LLC's Motion to Strike the Affidavit of Richard F. Bero [Docket No. 58] is **DENIED.**

DATED:  December 16, 2008          _____
at Minneapolis, Minnesota.                    s/ John R. Tunheim
                                                        JOHN R. TUNHEIM
                                                   United States District Judge